386 A.2d 918

**COMMONWEALTH of Pennsylvania**

v.

**Larry POTTER, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 21, 1975.

Decided March 23, 1978.

Reargument Denied May 8, 1978.

252

254

Martin Heller, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Abraham J. Gafni, Deputy Dist. Atty., Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

PER CURIAM.

The judgment of sentence is affirmed by an equally divided Court.

POMEROY, J., files an opinion in support of affirmance, in which EAGEN, C. J., and O'BRIEN, J., join.

ROBERTS, NIX and MANDERINO, JJ., filed separate opinions in support of reversal.

JONES, former C. J., did not participate in the consideration or decision of this case.

POMEROY, Justice, in support of affirmance.

Appellant Larry Potter has been tried three times for the murder of one Isaac Sinnamon during a June, 1970 attempt to rob the victim's neighborhood grocery store.[1] Each trial has resulted in Potter's conviction of murder in the first degree,[2] for which he was sentenced to a term of life imprisonment.

The central issue presented by this appeal is whether Potter's third trial for this offense was barred by the Double

1. Appellant's first conviction was set aside by this Court because of an improper expression of opinion by the prosecuting attorney as to guilt of the accused. *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971). Appellant's second conviction was set aside on post-trial motion by the court of common pleas en banc because of improper references to the defendant's juvenile record.

2. This Court has jurisdiction of this appeal under the Act of July 31, 1970, P.L. 673, No. 223, art. II, Section 202(1), 17 P.S. 211.202(1). The Act of February 15, 1870, P.L. 15, § 2, 19 P.S. 1187, mandates that we evaluate the sufficiency of the evidence in all cases of first degree murder. The following summary of the evidence is taken from the opinion of the judge who presided over Potter's third trial (Gutowicz, J.). The summary accurately reflects the record and clearly shows that the evidence was sufficient:

"In the early evening hours of June 16, 1970, Isaac Sinnamon was fatally shot during an attempted robbery at his store located at Fiftieth and Aspen Streets. The evidence indicates that the defendant, along with two companions, conspired to rob a store and, after obtaining a .25 calibre semi-automatic pistol, defendant and one of his accomplices went to the store of the deceased. It was closed and so they waited. Minutes later, a customer, Marjorie Anthony, arrived and knocked at the door. The deceased answered the door and, at her request, sold her a quantity of sausage. As she turned to leave, defendant, who was standing nearby, pulled out the pistol, shoved the deceased into the store and fired. The woman screamed and ran to a nearby house. At the sound of the screams, defendant fled from the scene and proceeded to a bar located at Fifty-Second Street and Lancaster Avenue. Entering the bar he inquired whether anyone would want to purchase the pistol and found a willing buyer in Charles Carter. Five days later, the pistol was seized by police when Carter was stopped for a motor vehicle violation. He was taken into custody for the Sinnamon murder but, when police investigated and confirmed his account of the transaction, he was released. Thereafter, defendant was arrested and gave police a statement admitting his involvement in the crime."

Jeopardy Clause of the Constitution of the United States.[3]
It is our view that it was not, and also that no reversible
error occurred in the third trial. We would therefore affirm
the judgment of sentence.

## I.

We must first consider whether the Double Jeopardy
Clause is implicated in the proceedings that have been had in
this case. The answer to this depends largely on the inter-
ests at stake in double jeopardy questions as those interests
have been developed and explained by the case law.

A double jeopardy claim is most commonly raised when a
mistrial has been declared over the objection of the defend-
ant. In such cases, the constitutional permissibility of a new
trial depends on whether there was "manifest necessity" for
the declaration. *United States v. Perez*, 22 U.S. (9 Wheat.)
579, 580, 6 L.Ed. 165, 166 (1824); see, *e. g., Illinois v.
Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425
(1973); *Commonwealth v. Brown*, 451 Pa. 395, 301 A.2d 876
(1973); *Commonwealth v. Lauria*, 450 Pa. 72, 297 A.2d 906
(1972). The "manifest necessity" standard exists because
the defendant has a "valued right to have his trial completed
by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684,
689, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949). As Mr.
Justice Harlan explained: "If that right to go to a particu-
lar tribunal is valued, it is because  .   .   .  the defendant

3. Before commencement of his third trial, Potter filed a motion to
dismiss the case and to be discharged on double jeopardy grounds.
The motion was denied and no appeal was taken from the order of
denial at that time. Following the third trial and conviction Potter
again raised the issue in his post-trial motions.

In *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977), a
majority of this Court agreed that an order denying a motion to
dismiss pre-trial on double jeopardy grounds was immediately ap-
pealable. See also *Commonwealth v. Haefner*, 473 Pa. 154, 373 A.2d
1094 (1977). Because, however, the instant appeal was taken in
October, 1974, long before our decision in *Bolden, supra*, we cannot
say that Potter's failure to appeal from the order denying his motion
to dismiss was a waiver of his double jeopardy claim.

This case was assigned to the present writer on September 28,
1977 for the purpose of preparing an opinion reflective of the views
of the majority of this Court.

has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial." *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556 (1971) (plurality opinion).

This type of double jeopardy question, however, is not present in the case at bar. In appellant's second trial there was no declaration of a mistrial over appellant's objection; rather, appellant himself several times moved for a mistrial, and the motions were denied. It was later determined by the lower court en banc that a new trial was necessary because appellant's constitutional right to a fair trial, e. g., *Commonwealth v. Thompson*, 444 Pa. 312, 281 A.2d 856 (1971), had been transgressed. When a conviction is set aside because of trial error, as appellant's second conviction was, the usual rule, sometimes referred to as "the *Ball* principle," is that the Double Jeopardy Clause is not a bar to reprosecution. *E. g., United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *Forman v. United States*, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960). See also *Commonwealth v. Melton*, 406 Pa. 343, 178 A.2d 728 (1962); *Commonwealth v. Scoleri*, 415 Pa. 218, 344 46, 202 A.2d 521 (1964); *Commonwealth ex rel. Patrick v. Banmiller*, 398 Pa. 163, 164, 157 A.2d 214 (1960). Similarly, when a mistrial is granted at the defendant's request, there is usually no bar to reprosecution. See, e. g., *Commonwealth v. Barille*, 270 Pa. 388, 392 94, 113 A. 663 (1921).

To be sure, the Double Jeopardy Clause

"represents a constitutional policy of finality for the defendant's benefit in . . . criminal proceedings . . [S]ociety's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in the enforcement of criminal laws." *United States v. Jorn, supra*, 400 U.S. at 479, 91 S.Ct. at 554, 27 L.Ed.2d at 553.

But the *Ball* principle is nevertheless well established. Thus it is that the Double Jeopardy Clause does not require that only one trial of a defendant be allowed, and that if that one trial contains error, the defendant may not again be tried. Among the explanations that have been proffered for this rule are that the new trial is part of one continuous "single criminal proceeding," *United States v. Jorn, supra,* 400 U.S., at 479, 91 S.Ct. 547, and that the double jeopardy bar does not arise until there is a sentence that is no longer subject to attack. See *Commonwealth v. Melton, supra,* 406 Pa. at 347, 178 A.2d 728. However that may be, societal interests militate against a literalistic reading of the Double Jeopardy Clause. As the Supreme Court of the United States has put it:

> "While different theories have been advanced to support the permissibility of retrial, of greater importance than the conceptual abstractions employed to explain the *Ball* principle are the implications of that principle for the sound administration of justice. Corresponding to the right of the defendant to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448, 451 (1964).

Reprosecution is not, however, permitted as a matter of course in any case in which a mistrial is ordered or a new trial granted at the behest of the defendant. We have noted the interests implicated by the double jeopardy prohibition, *viz.,* the defendant's right to an adjudication by a particular tribunal, his right not to be burdened with the anxiety and expense of repeated trials, his right to a fair trial, and society's interest in the punishment of those properly found guilty. A double jeopardy claim cannot be properly disposed of by analyzing any one of these factors to the exclusion of others; a balancing of the interests at stake is essential.

See generally Schulhofer, *Jeopardy and Mistrials*, 125 U.Pa. L.Rev. 449 (1977). In some circumstances, a defendant's fair trial interests may have been so unjustifiably damaged at a trial that he should not be subjected to another trial even though it was at the defendant's own request that another trial was granted. Here the appellant contends that the conduct of the prosecution at his second trial presents such a case. But before discussing that contention, it is necessary to consider a subsidiary question posed by this case.

As we have noted, appellant's mistrial motions during the course of the second trial were denied, but were later deemed meritorious by the court en banc, with the result that a new trial was awarded. The question then arises whether the fact that a new trial was the result of a decision by a reviewing court rather than the declaration of a mistrial by the trial judge requires that the exceptions to the *Ball* principle cannot be considered. We think not; a distinction between granting a new trial at the urging of a defendant and ordering a mistrial at his request is without significance for double jeopardy purposes. Recent cases in the Supreme Court of the United States have emphasized that in the field of federal criminal practice the applicability of double jeopardy analysis is not dependent on nice procedural distinctions. Thus in *Lee v. United States*, 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977), wherein the district court had characterized its action as a "dismissal of the information," it was held that a claim of double jeopardy "does not turn on whether the District Court labels its action a 'dismissal' or a 'declaration of mistrial,'" and that "the order entered by the District Court was functionally indistinguishable from a declaration of mistrial." Id. at 30, 97 S.Ct. at 2146, 53 L.Ed.2d at 87. See also *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977); *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). Although we are not here presented with the problems of characterization of trial rulings that existed in the cited cases, we think that a functional analysis of the type employed in those cases is

equally appropriate to the case at bar. Were the permissibility of reprosecution to be governed by a more relaxed standard where a verdict is set aside post-trial than where a mistrial is granted on motion during trial, trial judges might be led "to reject the most meritorious mistrial motion . . . and to require, instead, that the trial proceed to its conclusion despite a legitimate claim of seriously prejudicial error." *United States v. Dinitz,* 424 U.S. 600, 610, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267, 275 (1976). Accordingly, we conclude both that we must consider appellant's claim that prosecutorial misconduct at his second trial barred reprosecution, and that in doing so we should apply the same standard that would determine whether or not a retrial would be barred after a mistrial had been granted at defendant's request.

## II.

Appellant contends that misconduct by the prosecution at his second trial should have barred reprosecution and thus a third conviction. It is urged that retrial should be barred (a) if the misconduct was motivated by an intent to force the defendant to move for a mistrial, and (b) if the misconduct was "reckless." For the reasons to be discussed in Part III of this opinion, we find that the former type of conduct did not occur. Our reasons for disagreement with the "recklessness" standard urged by appellant are the subject of this section.

In deciding whether the circumstances in this case are such that reprosecution should be barred because of prosecutorial misconduct, we are guided by decisions both of this Court and the Supreme Court of the United States. In several Pennsylvania decisions which preceded the date that the federal double jeopardy prohibition was made applicable to the states,[4] this Court established a standard under which

4. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). It is to be noted that Pennsylvania decisions before *Benton* followed the longstanding view in this Commonwealth that the double jeopardy clause in the Pennsylvania Constitution was applicable only to capital offenses. E. g., *Commonwealth v. Warfield,* 424 Pa. 555, 558, 227 A.2d 177 (1967); *Commonwealth v. Baker,* 413 Pa. 105,

reprosecution would be barred although a mistrial was declared at a defendant's request. As restated in *Commonwealth v. Wright*, 439 Pa. 198, 201, 266 A.2d 651, 653 (1970):

"From our decisions in *Commonwealth v. Metz*, 425 Pa. 188, 228 A.2d 729 (1967); *Commonwealth v. Warfield*, 424 Pa. 555, 227 A.2d 177 (1967), and *Commonwealth ex rel. Montgomery v. Myers*, 422 Pa. 180, 220 A.2d 859 (1966) has developed the rule that a defendant who has moved for a mistrial in response to prosecutorial misconduct may be retried if the prosecution has not invited the mistrial in order to secure another, possibly more favorable opportunity to convict the accused.[*] This is because society's interest in preventing the guilty from going unpunished out-weighs the risk of harassment and the burdens the defendant will incur in going through a second trial."

Subsequent decisions in the United States Supreme Court, which are binding on the states, express a similar view:

"The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad-faith conduct by judge or prosecutor,' *United States v. Jorn*, supra, at 485, 91 S.Ct. 547, 27 L.Ed.2d 543, threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant. *Downum v. United States*, 372

---

196 A.2d 382 (1964); *McCreary v. Commonwealth*, 29 Pa. 323 (1857). See also *Commonwealth v. Campana*, 452 Pa. 233 at 243, 304 A.2d 432 (1973) (plurality opinion of Roberts, J.) and *id.* 452 Pa. at 269, 304 A.2d 432 (dissenting opinion of Pomeroy, J.).

\* The footnote to this passage in *Commonwealth v. Wright, supra*, is as follows:

"Some have suggested an even stronger rule. 'Moreover, deliberate prosecutorial misconduct, designed to prejudice the jury or force the defense to move for mistrial, arguably should justify dismissal of the indictment. The prosecutor, as a public official, does not play a purely adversary role and should be deterred as strongly as possible from abusing his authority by introducing even minor injustices into the adjudicatory process.' 82 Harv.L.Rev. 1752, 1756 (1969)." *Id.*

U.S. 734, 736, [83 S.Ct. 1033] 10 L.Ed.2d 100, 102–03 (1963)."

*United States v. Dinitz, supra,* 424 U.S. at 611, 96 S.Ct. at 1081, 47 L.Ed.2d at 276 (additional citations omitted). Similarly, in *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977), the Supreme Court stated:

> "It follows under *Dinitz* that there [is] no double jeopardy barrier to [an accused's] retrial unless the judicial or prosecutorial error that prompted [a defendant's mistrial] motions was 'intended to provoke' the motions or was otherwise 'motivated by bad faith or undertaken to harass or prejudice' . . . Neither error [asserted by Lee] . . . was the product of the *kind of overreaching outlined in Dinitz.*" *Id.* at 33, 97 S.Ct. at 2148, 53 L.Ed.2d at 89 (emphasis added).

Appellant would have us read the word "overreaching" as embracing not only deliberate prosecutorial misconduct, as defined in *Dinitz,* but also "recklessness" or "gross negligence" of the prosecuting attorney of such a nature as to deprive the defendant of a fair trial. We think that such a standard is unwarranted.

In the first place, appellant's view is not supported in the cases. Appellant's view does, however, find favor in the opinion announcing the decision of this Court in *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90, 108 (1977).[5] There the term "prosecutorial overreaching" was defined as embracing not only intentional misconduct but also "gross negligence." It was argued that since the Supreme Court in *Dinitz* did not explicitly rule out the use of the "gross negligence" standard, such a standard was a proper one for measuring prosecutorial misconduct which, if found, would bar retrial. *Id.* 472 Pa. at 637 n. 36, 373 A.2d at 109 n. 39. But the federal cases cited in support of this proposition used "gross negligence" standards in dictum and are frail

---

5. The opinion announcing the decision of the Court in *Bolden* spoke only for Mr. Justice ROBERTS and Mr. Justice MANDERINO.

reeds upon which to posit such a holding.[6]   A subsequent decision of a federal court of appeals, *United States v. Martin,* 561 F.2d 135 (8th Cir. 1977), does hold that "gross negligence" amounts to the sort of "prosecutorial over-reaching" that bars a retrial.   This decision, however, is not binding on this Court, nor do we find it persuasive.

The majority in *Martin,* citing *Dinitz* and *Lee, supra,* noted that prosecutorial conduct "motivated by bad faith or undertaken to harass or prejudice the [accused]," *Dinitz, supra,* 424 U.S. at 611, 96 S.Ct. at 1082, 47 L.Ed.2d at 276,

---

**6.**   The two federal cases principally relied upon in *Bolden* were *United States v. Beasley,* 479 F.2d 1124 (5th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158 (1973), and *United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976).

In *United States v. Beasley, supra,* the court held that a question by the prosecutor directed to the defendant's chief alibi witness, although improper because it suggested that the defendant had been a fugitive from justice as a result of an undisclosed crime two months prior to the offense for which he was then on trial, was part of a legitimate cross-examination.

"The appellant argues that the prosecutor by asking a baseless and inflammatory question, precipitated a mistrial to rescue an inadequate prosecution before the case went to the jury.   Our review of the record discloses no evidence of gross negligence or intentional misconduct such as would bar reprosecution.   .   .   . The fact that the government attorney later stated to defense counsel that he was not displeased with a mistrial does not prove that the prosecutor intended to abort the proceedings to improve the chance of a conviction on retrial.   The record as a whole indicates that the district attorney preferred to continue with the first trial.   Since the prosecution presented virtually the same witnesses and evidence at both trials, there is no evidence that the mistrial allowed the state an opportunity to strengthen its case." 479 F.2d at 1127.

From this excerpt it is clear that in considering the double jeopardy claim of a defendant who himself had moved for a mistrial, the court of appeals looked to whether the prosecutor attempted to secure a strategic advantage from a mistrial, or was in fact benefited by the opportunity to retry the case at a later time.

In *Kessler, supra,* although the court quoted the "gross negligence" language from *Beasley, supra,* see 530 F.2d at 1256, it held that there was "intentional misconduct by the Government regarding   .   .   . a known false exhibit, which causes serious prejudice to the defendants' rights to a fair jury trial," *id.* at 1257, and that this misconduct barred a retrial.   The court clearly indicated that a "stringent analysis of the prosecutor's conduct, considering the totality of the circumstances prior to the mistrial," was necessary in order to make this determination.   *Id.* at 1256.

would bar reprosecution upon a mistrial sought by the defendant. The court went on to hold, however, that the prosecutor's "gross negligence" in reading irrelevant and prejudicial grand jury testimony to the petit jury "can best be described as prosecutorial error undertaken to harass or prejudice the defendant—prosecutorial overreaching." 561 F.2d at 140 (footnote omitted). Precisely how the court of appeals in *Martin* could equate even grossly negligent conduct with conduct "undertaken to harass or prejudice the defendant" is unclear; conduct which is *undertaken* with a particular end in view is not negligent conduct, it is intentional conduct. The *Martin* court also relied on its finding that the prosecutor's actions "gave appellant no choice except to move for a mistrial and subject himself to the ordeal of another trial." *Id.* at 141.

Both of the grounds of decision in *Martin* are highly suspect under the rationale of *United States v. Dinitz, supra.* In *Dinitz* the trial judge barred from the courtroom one of defendant's three lawyers after the attorney had violated, at least four times, the court's order prohibiting references in the opening address to the jury that were not based on admissible evidence. When the trial judge was later informed that defendant's two other counsel were not prepared to try the case, the judge outlined three options to defendant, one of which was to move for a mistrial. Defendant chose so to move, and the motion was granted. The court of appeals reasoned that it was judicial overreaction which had placed the defendant in a position where he had to move for a mistrial and could not "be said to have relinquished voluntarily his right to proceed to the first jury." *United States v. Dinitz,* 492 F.2d 53, 59 (5th Cir.), *aff'd en banc,* 504 F.2d 854 (5th Cir. 1974) (8–7 decision). Having found an involuntary "waiver," the court then applied the "manifest necessity" standard to determine whether the grant of defendant's mistrial motion should have barred reprosecution, and concluded that retrial was barred. The Supreme Court reversed:

"In such circumstances [as those presented in *Dinitz*] the defendant generally does face a 'Hobson's choice' between giving up his first jury and continuing a trial tainted by prejudicial judicial or prosecutorial error. [But] [t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course of conduct to be followed in the event of such error." 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267, 275.

Thus the Supreme Court in *Dinitz* drew a marked distinction between the defendant's own tactical choice (mistrial or reversal), and conduct by the prosecution or the judiciary which, regardless of what choice the defendant has made, independently bars reprosecution. That is to say, the critical question is not *whether* defendant was "forced" to seek a mistrial, but *why* he makes the decision he does. On this issue, the *Dinitz* Court was clear:

"Even accepting the appellate court's conclusion that the trial judge overreacted in expelling [the lawyer] from the courtroom, the court did not suggest, [defendant] does not contend, and the record does not show that the judge's action was motivated by bad faith or undertaken to harass or prejudice the [accused].

"Under these circumstances we hold that the Court of Appeals erred in finding that the retrial violated [defendant's] constitutional right not to be twice put in jeopardy." 424 U.S. at 611–12, 96 S.Ct. at 1082, 47 L.Ed.2d at 276 (footnote omitted).

In the case before us, appellant's argument takes us too close to the slippery characterization of defendant's having been "forced" to move for a mistrial. Moreover, we do not agree with the contention that the phrase "undertaken to harass or prejudice the [accused]," *id.*, at 611, 96 S.Ct. at 1082, includes the concept of "grossly negligent" conduct simply because it fails to exclude that idea. The Court in *Dinitz* took care to define in comprehensive fashion that phrase: " '[h]arassment of an accused by successive prosecutions or [a] declaration of a mistrial *so as to afford the*

*prosecution a more favorable opportunity to convict'* the defendant." *Id., quoting Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100, 102–03 (1963) (Douglas, J.) (emphasis added). *Accord, Lee v. United States,* 432 U.S. 23, 33, 97 S.Ct. 2141, 2148, 53 L.Ed.2d 80, 89 (1977) ("it follows under *Dinitz* that there [is] no double jeopardy barrier to . . . retrial unless the judicial or prosecutorial error that prompted [defendant's mistrial] motion was 'intended to provoke' the motion or was otherwise 'motivated by bad faith or undertaken to harass or prejudice . . . .') (Powell, J.); *United States v. Jorn,* 400 U.S. 470, 485 n.12, 91 S.Ct. 547, 556, 27 L.Ed.2d 543, 556 n.12 (1971) ("judicial or prosecutorial impropriety designed to avoid an acquittal") (plurality opinion) (Harlan, J.); *Commonwealth v. Wright,* 439 Pa. 198, 201, 266 A.2d 651, 653 (1970) ("prosecutorial misconduct [that] invited the mistrial in order to secure another, possibly more favorable opportunity to convict the accused."). In short, we agree with the dissenting judge in *Martin, supra,* that "it is clear that *Dinitz* requires bad faith harassment intended to goad the defendant into requesting a mistrial before reprosecution will be barred." 561 F.2d at 142 n.1 (Henley, J., dissenting).

■ We believe that the same conclusion is reached when the interests implicated by the Double Jeopardy Clause are considered. Only when a deprivation of defendant's right to continue a trial before a particular tribunal is accomplished without his choice and no "manifest necessity" for so doing is present, or when that deprivation is caused by misconduct designed to force the defendant to seek a mistrial, is the defendant so unjustifiably deprived of his right to the first jury's decision that society's interest in the punishment of those properly found guilty must give way to a discharge of the accused. When this deprivation is not the evident purpose of the prosecution, it is the defendant's and society's interest in a fair trial that is primarily affected, and the remedy of a new trial, while it does of course affect the defendant's interest in the first jury's decision, is necessary and sufficient to vindicate both the citizen's interest in a fair

trial and the societal interest in bringing those properly found guilty to punishment.[7]

■ In sum, the public interest in convicting those guilty of crimes is too important an interest to be subordinated to a concept of a prosecuting attorney's negligence, even though it be labeled "gross"; defendants are adequately protected by the sanction of complete discharge which is imposed when the government's agent acts with the intent to abort the trial.[8] Accordingly, we believe that retrial should be barred when there is found to have been prosecutorial misconduct "intended to provoke mistrial requests," *Dinitz, supra,* at 611, 96 S.Ct. 1075, that is to say, when the prosecuting lawyer, judged by an objective standard, must be deemed to have been substantially certain that a mistrial would be declared as a result of his questions to witnesses or other conduct at trial.

### III.

■ We turn to the application of this standard to the facts of the case. To resolve the question whether the Commonwealth had a right to try Potter a third time, we must direct our attention to the conduct of the second trial, and assess the degree of impropriety and of prejudice to the defendant's right to a fair trial which was involved in the alleged misconduct of the prosecutor during that second

7. It should be kept in mind that if a mistrial motion is refused, and the jury enters a verdict of acquittal, reprosecution is absolutely forbidden; no circumstances however exigent, including deliberate misconduct by the defense, will provide an exception. *See, e. g., Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629, 631 (1962) (directed verdict of acquittal "was based upon an egregiously erroneous foundation"; reprosecution nonetheless barred).

8. It is worth noting that in the so-called "gross negligence" type of situation, it lies within the power of trial judges to prevent or punish such conduct in ways other than by granting mistrials or new trials. A presiding judge can and should exercise sufficient control over trial proceedings through the use of reprimands in open court and, in extreme cases, the judicious use of the contempt power.

proceeding.  This requires close attention to the sequence of events and the exact language used by the parties and the trial court.

At two points in Potter's second trial the trial judge seriously considered granting a defense motion for a mistrial.  The first point came during the Commonwealth's case in chief when the prosecutor was questioning Detective Thompson, the officer who had arrested first one Emmett Vinson and then, after Vinson implicated Potter, the appellant himself.  The relevant portions of the trial transcript are summarized or quoted in the margin.[9]

**9.** During a side bar conference the trial judge instructed the prosecutor not to bring out the investigative chain referred to in the text. There followed an extended discussion concerning the exact limits within which the witness could be questioned.  The examination of the witness Thompson was then resumed:

"Q. [By the assistant district attorney] As a result of information received some time after June 21st did you arrest anyone else.
A. Yes.
Q. As a result of the information received in the letter who did you arrest?
Mr. Heller [defense counsel]: Objection.
The Court: I don't think it makes any difference how he got it. The objection is overruled simply because it doesn't make any difference.
Did you arrest somebody?
The Witness: Yes, I did.
The Court: Whom did you arrest?
The Witness: Emmett Vinson.
Mr. Levine [the prosecuting attorney]: Now, was Emmett Vinson taken down to the police station?
A. Yes, he was.
The Court: What does that got to do with this case?
Mr. Levine: I will bring it out.
Mr. Heller: That is exactly what we are talking about." N.T. at 1273–74.

A side bar conference followed during which the trial judge admonished the assistant district attorney that his questions had been impermissible and defense counsel argued that the prosecutor had committed contempt in violating a direct order of the court.  The defense also moved for a mistrial.  The trial was recessed overnight, and at the opening of court the next day the trial judge made the following statement out of the hearing of the jury:

"The particular remark that triggered all of this discussion . . .
I have had read back and I must say I inadvertently participated in this which elicited the name of Mr. Vinson and cannot hold Mr.

The second incident occurred during the cross-examination of the defendant's character witness, his pastor, the Reverend Mr. Smalls. In brief, the prosecutor asked the witness whether he had spoken to Emmett Vinson about the appellant's reputation. The trial judge sustained the defense counsel's objection to this question[10] and cautioned the prosecutor. The relevant portions of this colloquy between court and counsel and of Mr. Smalls' cross-examination are reproduced in the margin.[11]

Levine completely responsible for what happened here." N.T. 1280.

10. The gravamen of the objection was that the assistant district attorney was trying to bring out inadmissible hearsay, i. e., the fact that Vinson had implicated Potter.

11. "Mr. Levine [the assistant district attorney]: I've got a right to test his credibility.

The Court: What other names are you going to ask him?

Mr. Levine: I am not going to reveal that to the Court. I can cross-examine him.

Mr. Heller: I will make an application.

The Court: I will make this ruling that you cannot ask him, again. It is already in front of the jury. I will instruct them to ignore it." N.T. 1539-40.

A defense mistrial motion was denied at this point. Later in the cross-examination of the character witness there occurred the following colloquy:

"Q. Among those people who you spoke to about his reputation for being a good citizen, did you speak to Judge Hoffman, Judge Spaulding, Judge Green."

Mr. Heller: Objected to. I move for a mistrial.

\* \* \* \* \* \*

The Court: The motion for a mistrial is overruled.

Ladies and gentlemen of the jury, this question is not in keeping with the kind of cross-examination that we would accept and that's why I'm asking you to ignore it.

\* \* \* \* \* \*

"The Court [to counsel]: Now, you have a perfect right to cross-examine to the extent on those persons. But there is no purpose in coming up with names of people who live in the neighborhood. His community is his church and the people that he knows in the area. So I think you got to stay within his own area." N.T. 1548 et seq.

The prosecutor resumed questioning:

"Q. Reverend Smalls, may I ask this question? Did you ever have an occasion afterwards, after the homicide and after the arrest of Mr. Potter for homicide—my question is, did you speak to people in the community then?

It is undisputed, of course, that a reference to the juvenile record of a defendant is improper in this jurisdiction.[12] It was on this ground alone that the conviction resulting from the second trial was set aside.[13] But as the quoted excerpts

A. About Mr. Potter?
Q. About his good reputation.
A. No, I did not.
Q. And that was after the homicide? So that after the killing and after he was arrested you did not speak to anybody and they did not speak to you, is that what you're telling the jury?
A. I solicited no opinions about Mr. Potter's previous record, what have you. Only about his welfare.
Q. You say you did not solicit anything about his previous record?
A. Yes.
Q. By the way, is Detective Thompson in your congregation?
A. Where is Detective Thompson?
Q. He is sitting with me. Don't you remember him from last time?
A. No. I keep quite busy doing things in town and I don't know Detective Thompson. I am quite sure he's not a member of my congregation. He may have visited sometime.
Q. If you were allowed to step down from the stand and discuss with Detective Thompson the reputation of the defendant, would you be willing to do that and then take the stand again?
Mr. Heller: Objected to. I move for a mistrial.
The Court: Well—
Mr. Levine: I'll withdraw that.
The Court: Objection sustained. Motion for a mistrial is overruled.
By Mr. Levine:
Q. Is Mr. John Hampton, the Superintendent of Glenn Mills Reformatory in your congregation?
Mr. Heller: Objected to. I move for a mistrial." N.T. 1550–51. [The motion was overruled.]

12. Act of June 2, 1933, P.L. 1433, § 19, 11 P.S. § 261 (1965). This act was in effect at the time of this trial and until repealed and replaced by the Juvenile Act, Act of December 6, 1972, P.L. 1464, No. 333, § 40, 11 P.S. § 50–337(a)(1) (Supp.1977–78). In *Commonwealth v. Jenkins*, 413 Pa. 606, 198 A.2d 497 (1964), this Court held that questions addressed to a character witness as to his awareness of juvenile charges against the defendant were improper as accomplishing the abuse which the 1933 Act was intended to prevent.

13. In his opinion for the court en banc on post-trial motions, the trial judge gave his reasons:
  "In our view, the clear import of the evidentiary content of the questions was that the defendant had a juvenile crimes record . . . . [I]n the context of the questioning, we believe that they [the members of the jury] could have no doubt that the suggested prior experiences of the defendant with the judiciary were criminal

from the record show, the trial judge's rulings on the objections were narrow; we cannot conclude that the prosecutor at any point violated a specific, direct order of court as to either the proper form or the permissible subject matter of his questions.

This is not to say that the prosecuting attorney was not at fault in the form or substance of some of the questions put to the witness. There is no doubt that the cross-examination of a character witness must be carefully limited to minimize the real possibility of prejudice to the defendant. See *Commonwealth v. Jenkins*, 413 Pa. 606, 198 A.2d 497 (1964); *Commonwealth v. Selkow*, 206 Pa.Super. 273, 212 A.2d 919 (1965).[14] The chalk line that must be walked in interrogating such a witness as to the grounds of his knowledge is a narrow one. See III J. Wigmore, Evidence, § 998, at 912 (Chadbourn rev. 1970). It was, as the court en banc held, overstepped in the case at bar.

That some of the questions put to the character witness by the prosecutor were improper for the reasons discussed

in character. In no event . . . could there be any doubt that a juvenile court conviction is suggested by reference to the Glen Mills Reformatory." Opinion of Barbieri, J., at p. 8.

14. As Mr. Justice (now Chief Justice) EAGEN observed in writing for the Court in *Commonwealth v. Jenkins*, 413 Pa. 606, 198 A.2d 497 (1964):

"Character witnesses may legitimately be questioned as to whether or not they ever heard *persons in the neighborhood* attribute particular offenses to the defendant. This is allowable for the purpose of testing the accuracy of the witness's testimony by showing that he or she is not thoroughly familiar with the reputation concerning which he has testified. However, prejudicial questions, which obviously are for the purpose of showing the commission of a specific crime or crimes for which the defendant is not presently accused, are not legitimate or fair upon cross-examination." *Commonwealth v. Jenkins*, 413 Pa. 606, 607–608, 198 A.2d 497, 498 (1964) (emphasis in original).

See also, *Commonwealth v. Becker*, 326 Pa. 105, 191 A. 351 (1937); *Commonwealth v. Jones*, 280 Pa. 368, 124 A. 486 (1924); *Commonwealth v. Hart*, 163 Pa.Super. 232, 6 A.2d 828 (1948); *Commonwealth v. Beck*, 122 Pa.Super. 123, 184 A. 761 (1936). In *Commonwealth v. Mashie*, 155 Pa.Super. 419, 38 A.2d 403 (1944), the court stated a requirement that the Commonwealth must ask such questions in a good faith belief that the defendant does have a record for the offense to which a reference is being made.

above means at least that the trial court correctly sustained the defense counsel's objections *once the questions had been asked.* Neither this conclusion, however, nor the trial court's later ruling that the questions were sufficiently prejudicial to the defendant to require a new trial warrants a conclusion that the Commonwealth forfeited its right to retry the appellant thereafter. To the contrary, the events that led up to the defendant's mistrial motion, as disclosed by the record, do not support a finding of intentional misconduct or bad faith by the prosecutor. The record amply supports the specific finding of the trial judge, in ruling on Potter's motion to dismiss the charges before the third trial, that the prosecutor at the second trial had *not* intended to procure a mistrial. Indeed, there was no apparent reason why the prosecution would wish another trial before a different jury; as the court en banc noted in granting Potter's motion for a third trial, the Commonwealth's evidence in the case was overwhelming. Thus there was no bar to a third trial.

## IV.

Since there was in our view no prohibition to retrial in this case, the errors appellant assigns arising from his third trial must be considered. Of the multiple assignments of error, only one appears from the record to merit discussion.[15]

A key defense witness, Irene Williamson, who had been an eyewitness of the killing with which Potter had been charged, testified that Potter was not involved. The Commonwealth called as a rebuttal witness William Stevens, Esquire, who was the assistant district attorney in charge of the first trial. He testified that during the trial Mrs.

15. The appellant also complains that "by his words and conduct, [the trial judge] entered the case as an advocate for the prosecution," (Brief at p. 2) that certain inflammatory remarks by the prosecutor in his closing address require reversal, and that a statement made by the defendant should have been suppressed as involuntary or as the product of unnecessary delay in arraignment. Our review of the record satisfies us that these claims are without merit.

Williamson had, in a conversation with him, positively identified Potter as the one who shot Isaac Sinnamon; that to his knowledge she had never positively identified any suspect during the investigation; and that as a result of her responses to further questions asked by Stevens, he told her that he did not expect to need her as a witness in the case and that she could go home. Stevens further testified that Mrs. Williamson continued to appear at the trial every day, and that some days later, Martin Heller, Esquire, Potter's counsel, approached him and asked Mrs. Williamson to repeat to Stevens what she had just told Heller. Mrs. Williamson then stated that Larry Potter was not involved. Stevens' direct testimony concluded as follows:

"BY MR. GELMAN [assistant district attorney]:

Q. Tell us what happened after Mrs. Williamson stated in your presence and Mr. Heller's presence that Mr. Potter was not the murderer?

A. Well, I was not—on this occasion I was not surprised at what Mrs. Williamson had said, because as a result of her original statement to me that that was the boy, which to my knowledge she had never made before to the detectives, and as a result of responses to other questions I put to her after she said that, I fully expect—I was prepared not to be surprised at anything she said."

\* \* \* \* \* \*

"Q. When Irene Williamson identified Mr. Potter to you from that adjacent courtroom as the youth between the two attorneys, Mr. Stevens, you said that you excused her as a witness thereafter?

A. Yes. I told her she need not come. I didn't say she had to stay away.

Q. Even though she was willing to identify Mr. Potter you took it upon yourself to excuse her, and I would like to make that clear, why did you do that?

MR. HELLER [defense counsel]: Objected to, Your Honor. Mr. Gelman is now arguing and testifying in effect.

THE COURT: His next question is why. Overruled. I will limit it to why he excused her.

MR. HELLER: I will object to that also.

THE COURT: You may object to it. The objection is overruled.

MR. HELLER: Sir—

THE COURT: Overruled.

MR. HELLER: Surprising.

THE WITNESS: I excused her because I thought it would be improper for me to offer her as a reliable witness. I considered her unreliable.

MR. HELLER: Objected to and I move for a mistrial.

THE COURT: Overruled. Your motion for mistrial is denied.

MR. GELMAN: Your witness.

THE COURT: I might say to the jury this is only the opinion of a witness. You, the members of the jury, are to determine the credibility or believability of the witnesses, and Mr. Stevens falls within that line as does every witness that takes the stand." (N.T. 432–34).

Defendant rests his argument upon this Court's decision in *Commonwealth v. Russell*, 456 Pa. 559, 322 A.2d 127 (1974), wherein a former district attorney, testifying for purposes of impeachment, stated from the stand that "there was no doubt, no doubt whatsoever, that he [defendant] had masterminded this crime." In reversing and granting a new trial, we noted that the prosecutor had "made every effort to impress upon the jury the witness was a 'former assistant district attorney' . . . [which] clearly bear[s] upon his credibility . . ." 456 Pa. at 564, 322 A.2d at 130. We concluded, moreover, that "when this witness made the statement he fully knew it was improper and highly prejudicial," and entirely without any proper foundation. *Id.*

We believe, however, that *Russell* is not controlling and that the mistrial motion was properly refused. As we said in *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973), *quoting Commonwealth v. Phillips*, 183 Pa.Super.

377, 382, 132 A.2d 733, 736 (1957) (citations omitted) (emphasis deleted):

"Every unwise or irrelevant remark made in the course of trial by a judge, a witness, or counsel does not require the granting of a new trial. A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial."

The effect of remarks such as those made by Stevens depends on the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court. See *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975), and cases cited therein. The trial judge in the case at bar, speaking for the court en banc on a motion for a new trial (*i. e.*, a fourth trial), concluded as follows:

"[W]e believe the statement by witness Stevens that he excused the witness from testifying because he considered her unreliable was strongly based upon the evidence and with proper foundation . . . [T]he unadorned statement of witness Stevens is properly construed as a well-founded belief based on the evidence . . .

"This is not a case where the district attorney has expressed any opinion as to guilt or where he has emphatically characterized or branded the defendant a liar . . . or has accused the defense witnesses of lying and perjury . . . The statement of Stevens is at worst ambiguous and, as the proper action in such a case is largely for the discretion of the trial judge, the Court's instruction to the jury that Stevens' opinion was only that of a witness whose credibility was as much a matter of determination for the jury as that of the witness Williamson was sufficient to negate any possible prejudice." Opinion at p. 5.

In the circumstances of this case, we believe that the trial court was correct. The Commonwealth had already introduced evidence that Mrs. Williamson had several times indicated that other persons shown to her in lineups might well be the culprit. The record clearly shows that the witness's

concluding statement was in essence a shorthand expression of what he had already told the jury without objection. Compare *Commonwealth v. Knight*, 469 Pa. 57, 70–75, 364 A.2d 902, 908–11 (1976). Finally, the statement objected to was followed immediately by instructions from the court that Stevens' testimony was entitled to no special weight. Compare *Commonwealth v. Maloney*, 469 Pa. 342, 349, 365 A.2d 1237, 1242 (1976). On this record, we cannot say that the effect of Stevens' statement was to prejudice the jury or that it tended to deprive the defendant of a fair trial. See *Commonwealth v. Joyner*, 469 Pa. 333, 335–36, 365 A.2d 1233 (1976); *Commonwealth v. McNeal*, 456 Pa. 394, 398–400, 319 A.2d 669 (1974); *Commonwealth v. Martinolich*, 456 Pa. 136, 148–50, 318 A.2d 680, *appeal dismissed and cert. denied*, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973); *Commonwealth v. Simon*, 432 Pa. 386, 248 A.2d 289 (1968).[16]

For all of the foregoing reasons, we would affirm the judgment of sentence.

Mr. Chief Justice EAGEN and Mr. Justice O'BRIEN join in this opinion.

ROBERTS, Justice, in support of reversal.

The Commonwealth has now tried appellant Larry Potter three times for murder. The first two convictions have been reversed, once by this Court and again by the trial court en banc, because of prosecutorial misconduct. Appellant con-

16. Appellant contends that this asserted error has so added to the taint of prior errors as to result in a denial of "fundamental fairness and due process of law", Brief at 6, and that this Court, "in exercise of its supervisory authority over the administration of the criminal justice system," Brief at 13, should dismiss the indictment with prejudice. Since we find that there was no error in the third trial, we necessarily reject this contention. In addition, we note that the due process interest to which appellant points is itself informed by the interests involved in the Double Jeopardy Clause, *see Lee v. United States*, 432 U.S. 23, 34 n. 10, 97 S.Ct. 2141, 2148, 53 L.Ed.2d 80, 90 n. 10; *Palko v. Connecticut*, 302 U.S. 319, 325, 328–29, 58 S.Ct. 149, 82 L.Ed. 288, 292, 293–94 (1937), and we cannot say that appellant's due process rights were violated by a third prosecution, or that they would be by a fourth.

tends that such misconduct precluded a third trial without violating his right not to be held twice in jeopardy.

The Opinion of Mr. Justice Pomeroy rejects appellant's assertion by concluding that unless the misconduct of the prosecuting attorney was intended to provoke the accused to request a mistrial, retrial is not barred. Applying this standard to the facts of this case, the Opinion of Mr. Justice Pomeroy finds no such intentional misconduct.

I find totally unpersuasive the reasons offered by the Opinion of Mr. Justice Pomeroy that an intentional misconduct standard protects the right of an accused not to be placed twice in jeopardy. Moreover, the Opinion of Mr. Justice Pomeroy ignores the public interest in the prompt and proper resolution of criminal litigation. The important public interest in vindicating its criminal laws in one trial can better be served if the inquiry in such cases focuses on whether the misconduct of the prosecuting attorney was grossly negligent. The grossly improper prosecutorial misconduct in appellant's second trial, as in the previous trial, in no way advanced the Commonwealth's interest in affording appellant a fair trial. Instead, that gross misconduct unjustifiably caused the reversal of appellant's second trial, and all the attendant delays, burdens and unnecessary expenditures of judicial, professional, and public resources. I would discharge appellant because of the gross negligence of the prosecuting attorney in appellant's second trial.

The Opinion of Mr. Justice Pomeroy also rejects appellant's assertion that testimony of William Stevens, prosecuting attorney in appellant's first trial, impeaching the credibility of a key defense witness, constitutes further misconduct depriving appellant a fair trial. I find appellant's claim meritorious, and would reverse appellant's third conviction because of the prejudicial misconduct of the prosecuting attorney.

I

The trial court en banc reversed appellant's second conviction, holding that the prosecutor's conduct throughout the

second trial was improper, denying appellant a fair trial. A witness, Rev. Leonard Smalls, testified on direct examination that appellant's reputation "in the eyes of the persons of my congregation is that he is a law-abiding person." The prosecutor's cross-examination of this witness consisted of a series of efforts to place inadmissible and prejudicial evidence before the jury.

During the direct examination of the police officer who arrested appellant, the prosecutor asked a series of questions to establish that appellant was arrested only after Emmett Vinson, a co-defendant tried separately, had been arrested and spoken to the police. The clear purpose of these questions was to suggest that Vinson had implicated appellant. The defense objected to these questions on hearsay grounds. The court sustained the objection and ruled that the prosecutor could not advise the jury that Vinson's arrest preceded appellant's. The prosecutor nevertheless elicited this information in violation of the court's ruling. The court immediately recessed the trial and asked defense counsel whether he would have any objection if the court requested the district attorney's office to replace the prosecutor:

> "THE COURT: Mr. Heller [defense counsel], would you have any objection if I asked the district attorney to replace Mr. Levine?
>
> .     .     .     .     .
>
> MR. HELLER: No, I have no objection   .   .   ..
> THE COURT: If you can't obey orders of the Court, Mr. Levine, you cannot try a case before me and it is just that simple."

After defense counsel requested a mistrial, the Court stated:

> "THE COURT: All right. As I think it over, I am more inclined to feel that the removal of trial counsel under these circumstances as just took place   .   .   .   would make this a very difficult case to try with someone else substituting for the assistant district attorney. And if we cannot work out some reliable understanding on this I think I am going to grant the mistrial, but I will make that decision either tonight or tomorrow morning."

The next day, the court denied appellant's motion for a mistrial, stating that it believed that instructions to the jury would cure any prejudice resulting from the prosecutor's misconduct.

In an obvious attempt to bring before the jury once again the improper suggestion that Vinson had implicated appellant, the prosecutor at the beginning of cross-examination asked Reverend Smalls whether he had spoken to Vinson about appellant's reputation. Defense counsel requested a mistrial and the court, although denying the motion, ordered the prosecutor not to mention the names of any co-defendants during cross-examination of Rev. Smalls.

> The prosecutor continued his examination by asking: "Q. Among those people who you spoke to about his reputation for being a good citizen, did you speak to Judge Hoffman, Judge Spaulding, Judge Green?"

The defense objected to this highly improper question. As the trial court en banc stated:

> "[T]he clear import [of the question] . . . was that the defendant had a juvenile crimes record. We are aware that it can be argued that the jury may not know the three judges mentioned, or that they were once juvenile court judges. In fact, they might even know that none of them now is a judge in that court. Yet, in the context of questioning . . . they could have no doubt that the suggested prior experiences of the defendant with the judiciary were criminal in character."

The trial court sustained the objection and instructed the jury to ignore the question. The court instructed the prosecutor to cease asking Rev. Smalls about individuals who "live in the neighborhood" and to limit his questions to individuals within the Reverend's congregation or personally known to him.

The court's admonition clearly instructed that the prosecuting attorney was to refrain from using his questions to create prejudicial inferences unsupported by admissible evidence. Nonetheless, the prosecutor resumed his questioning

with still another blatant attempt to establish such a prejudicial inference.

"BY MR. LEVINE:

Q. . Is Mr. John Hampton, the Superintendent of Glenn Mills Reformatory in your congregation?"

Defense counsel immediately objected and moved for a mistrial. The court sustained the objection but denied the motion for mistrial.

If any doubt existed that the earlier reference to Judges Hoffman, Spaulding and Green suggested to the jury that appellant had a prior juvenile record, the doubt was eliminated by the prosecutor's reference to the Glen Mills Reformatory. The court en banc concluded that the prejudice suffered by appellant as a result of the prosecutor's improper cross-examination was not cured by the trial court's instructions to the jury and granted appellant a new trial.

## II

Following reversal of his second conviction by the trial court en banc, and before his third trial, appellant filed a pre-trial application to dismiss the indictment on double jeopardy grounds. The trial court denied the application, and the Opinion of Mr. Justice Pomeroy now affirms, finding that the prosecuting attorney did not act for the specific purpose of causing appellant to move for a mistrial. In light of the three deliberate efforts, successively explicit, to place prejudicial information before the jury despite the trial court's instructions, it is difficult to accept the Opinion of Mr. Justice Pomeroy's characterization of the purpose of the prosecuting attorney's misconduct.

## A

Appellant challenges the standard employed by the court in ruling on his pre-trial application. He contends that the double jeopardy clause should bar reprosecution "when the prosecutor intentionally or recklessly subverted the trial . . . regardless of the prosecutor's motivation." He asserts that the prosecutor breached this standard at the

second trial, where the prosecutor made a "sustained, deliberate attempt to win a conviction in complete defiance of direct orders of the trial judge." I agree. The prosecutor's deliberate and continuous misconduct was as clear a demonstration of his improper motivation as a declaration of motive on the record.

The general rule is that the double jeopardy clause does not bar reprosecution after a mistrial granted upon the motion of the defendant. See e. g., *Arizona v. Washington*, —— U.S. ——, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977) (plurality opinion). When a defendant's request for a mistrial is caused by prosecutorial overreaching, however, the policies embodied in the double jeopardy clause, which is designed to protect a defendant from multiple prosecution, mandate that reprosecution be prohibited. *United States v. Martin*, 561 F.2d 135 (8th Cir. 1977); see *United States v. Dinitz*, supra; *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (plurality opinion); *Commonwealth v. Bolden, supra* (plurality opinion). These same principles apply when a new trial is granted after a prosecution ends in a defendant's conviction.

The double jeopardy clause does not ordinarily preclude reprosecution of a defendant whose conviction is set aside because of trial error. See, e. g., *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). In *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), the Supreme Court held that a defendant may be tried again for the same crime where his conviction was reversed in collateral proceedings on the ground that a guilty plea entered in the middle of his trial was not voluntary. The Court reasoned that if Tateo had requested a mistrial on the basis of the judge's comments which had coerced him into pleading guilty, and the request

> "had been granted or had underlain reversal on direct review, Tateo could have been tried again. . . .
> [S]imple logic compels the conclusion that if the Court

precluded retrial here, it would also have to preclude retrial in a similar case in which a mistrial is granted." Id. at 468 n.4, 84 S.Ct. at 1590 n.4. Thus, misconduct which would not bar retrial if a mistrial is granted before conviction cannot bar retrial if it serves as the basis of reversal of a conviction.

It follows that prosecutorial misconduct which would bar retrial if a mistrial had been granted must also bar a retrial if a request for mistrial is erroneously denied by the trial court and the defendant is forced to seek relief by obtaining a reversal of his conviction. Any other conclusion would be irrational; if a mistrial which should be granted would have barred reprosecution, a defendant cannot be entitled to less relief when the trial court is reversed because it denied a request for mistrial. Thus, the Opinion of Mr. Justice Pomeroy correctly concludes that in determining whether a defendant whose conviction is reversed due to prosecutorial misconduct may be reprosecuted, we must employ the same standard used in determining whether a reprosecution would be barred had the defendant's request for mistrial been granted. See *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977).

## B

The Opinion of Mr. Justice Pomeroy concludes that, where a mistrial is granted because of prosecutorial misconduct, retrial is barred only if the misconduct was specifically intended to force the accused to request a mistrial. The interests embodied in the double jeopardy clause are not, however, adequately protected by such a standard.

The double jeopardy clause spares an individual the burden of undergoing successive prosecutions for a single wrongful act. It is designed to preclude bad faith harassment by prosecutors as well as minimize the financial and emotional burden on the accused, avoid prolonged periods of stigma caused by unresolved accusations of wrongdoing, and limit the possibility that an innocent person might be convicted. *Arizona v. Washington, supra,* —— U.S., at ——, 98

S.Ct. at 829. See *Illinois v. Somerville,* 410 U.S. 458, 472, 93 S.Ct. 1066, 1074, 35 L.Ed.2d 425 (1973) (White, J., joined by Douglas and Brennan, JJ., dissenting); *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1774, 44 L.Ed.2d 346 (1975); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

Moreover, by promoting the policies underlying the double jeopardy clause, we further the prompt, effective, and orderly administration of criminal justice. A prohibition against unjustified relitigation of charges against an accused spares the public all the expenses of unwarranted retrial, promotes swift and certain enforcement of the law, avoids unnecessary burdens, delays, and costs on the judicial process and the administration of criminal justice, and assures that an accused will not be convicted on the basis of testimony faded by age or evidence otherwise stale or unavailable.

By barring reprosecution only when the prosecuting attorney acts for the express purpose of causing a mistrial, even when he intentionally or recklessly prejudices a defendant's right to a fair trial, the Opinion of Mr. Justice Pomeroy unduly restricts the protection afforded the accused by the double jeopardy clause. Under the Opinion of Mr. Justice Pomeroy's standard, so long as it cannot be said that the prosecuting attorney attempted to force the accused to move for a mistrial, retrial is not barred. Such a standard would not prevent harassment of the accused, deliberate disregard of his rights, or callous conduct flouting the administration of justice. Moreover, the Opinion of Mr. Justice Pomeroy's standard unwisely disregards all the public interests at stake. So long as the Commonwealth is not required to present its case according to professional standards of conduct, endless litigation of an accused's guilt, at great public expense, can ensue.

The public expects more of criminal justice than the Opinion of Mr. Justice Pomeroy recognizes. The public has a great interest in seeing that its judicial, financial, and professional resources are not wasted by prosecutorial mis-

conduct. Misconduct as demonstrated by this record does not advance justice, but imposes upon the accused and the public all the unjustified burdens of retrial.

The United States Court of Appeals for the Eighth Circuit recently adopted a standard barring reprosecution based on grossly negligent prosecutorial misconduct or misconduct in reckless disregard of an accused's right to a fair trial. *United States v. Martin,* 561 F.2d 135 (8th Cir. 1977). In *Martin,* the prosecuting attorney read to the jury improper and prejudicial remarks made by grand jurors and frequently interrupted the accused while testifying. The Court discharged the defendant concluding that even if such acts "were not intentionally designed to provoke a mistrial request, at a minimum they constitute gross negligence." Id. at 140. In formulating its conclusion that such gross negligence provides a basis for invoking the double jeopardy bar to retrial, the court stated:

> "The underlying idea, one that is deeply engrained in at least the Anglo-American system of jurisprudence, is that the state with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent may be found guilty. *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)."

Id. at 138.

This standard promotes the public interest in ensuring that its resources are utilized most effectively, in a manner calculated to decide the charges against the accused promptly and properly, without the burdens of delays and mistrials. See *Commonwealth v. Bolden, supra.*

## C

Here, the prosecuting attorney repeatedly disregarded specific court instructions and attempted to present inadmissible evidence. Even assuming that the prosecuting attor-

ney did not want to force appellant to request a mistrial, he most assuredly acted in a grossly negligent manner, recklessly disregarding appellant's rights and the public interest.

In asking Rev. Smalls whether he had spoken to Judges Hoffman, Spaulding, and Green, the prosecutor had no purpose other than to inform the jury that appellant had a criminal record. Even after the court sustained appellant's objection to that question and ordered the prosecutor to cease using this impermissible technique, the prosecutor persisted in his unprofessional attempt to prejudice appellant by referring to the Superintendent of the Glen Mills Reformatory. There is no place for such misconduct in the courts of this Commonwealth. By continually asking the type of question proscribed by the court, the prosecutor denied appellant a fair trial, caused the reversal of appellant's conviction by the court en banc, and unjustifiably imposed all the burdens of retrial on appellant and the public. Appellant should not be forced to bear the heavy burdens incident to reprosecution because of prosecutorial misconduct so conspicuously below professional standards. See *Commonwealth v. Bolden, supra* (plurality opinion); see generally ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution and Defense Function, the Prosecution Function § 1.1(a) -(d) (Approved Draft 1971); Pennsylvania Supreme Court Code of Professional Responsibility EC 6 -1, 6 5 (1974). Because the Opinion of Mr. Justice Pomeroy affirms the denial of appellant's pretrial application to dismiss charges, I dissent.

### III

The Opinion of Mr. Justice Pomeroy also concludes that prosecuting attorney Stevens' impeachment testimony did not deprive appellant a fair trial. I do not agree. Stevens' testimony was highly prejudicial.

Irene Williamson, an eyewitness, testified that appellant was not involved in the crime. The Commonwealth called Stevens to impeach Williamson. Stevens' flagrant misconduct required this Court to reverse appellant's first convic-

tion. *Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971). Stevens testified that Williamson and he spoke about the incident, and Williamson identified appellant as a perpetrator. The prosecuting attorney then asked Stevens why he did not call Williamson at the first trial to testify against appellant. Stevens responded: "I excused her because I thought it would be improper for me to offer her as a reliable witness. I considered her unreliable." The trial court denied appellant's request for a mistrial.

"In advocating the cause for this Commonwealth, prosecutors are to seek justice, not only convictions." *Commonwealth v. Cherry,* 474 Pa. 295, 301, 378 A.2d 800, 803 (1977). See *Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253 (1977); *Commonwealth v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975); see ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function § 1.1 (Approved Draft, 1971); Pennsylvania Supreme Court Code of Professional Responsibility EC 7-13 (1974). A prosecuting attorney's obligation to seek justice includes an obligation to ensure that an accused receives a fair trial. *Commonwealth v. Cherry, supra; Commonwealth v. Joyner,* 469 Pa. 333, 365 A.2d 1233 (1976); *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974). This obligation exists not only when a prosecuting attorney represents the Commonwealth but also when he testifies at trial. *Commonwealth v. Russell,* 456 Pa. 559, 322 A.2d 127 (1974).

Accordingly, the Court has held that a prosecuting attorney's comments on the credibility of an accused or his witnesses require reversal. E. g., *Commonwealth v. Joyner, supra; Commonwealth v. Collins, supra; Commonwealth v. Russell, supra.* By improperly commenting on the credibility of appellant's key witness Williamson, Stevens undeniably prejudiced appellant and deprived him a fair trial.

The trial court instructed the jury to consider the testimony of Stevens as it would testimony of any other witness. This instruction did not remove the prejudice. In such circumstances, only an instruction directing the jury to

disregard Stevens' unjustified remarks could neutralize the prejudice of the prosecutorial misconduct. *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974). At the very least, appellant's third conviction should be reversed.

I dissent and would order appellant discharged; alternatively, I would reverse appellant's third conviction.

NIX, Justice, in support of reversal.

I agree with the majority view that the third trial was not barred by the Double Jeopardy Clause of the Constitution of the United States. However, I cannot agree that the judgment of sentence entered after the third trial should be affirmed.

The Commonwealth's attempt to impeach the testimony of Mrs. Williamson, a crucial defense witness, by having a rebuttal witness express his personal opinion as to Mrs. Williamson's credibility was reversible error.

I would, therefore, reverse the judgment of sentence and award a new trial.

MANDERINO, Justice, in support of reversal.

Appellant argues that requiring " . . . appellant to undergo a third trial . . . violated [his] right to due process of law and his right not to be placed twice in jeopardy." I agree, and would therefore reverse the judgment of sentence and dismiss the indictments.

We reversed appellant's first conviction and remanded for a new trial because the prosecutor, one William Stevens of the Office of the District Attorney of Philadelphia, expressed to the jury his personal opinion that appellant's testimony was a "malicious lie." *Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971). Speaking for a unanimous five member court (former Chief Justice Bell and former Justice Barbieri did not participate in the consideration or decision of the case), Mr. Justice Roberts stated:

"The ABA Standards Relating to the Prosecution Function expressly state: 'It is unprofessional conduct for the

prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence . . . of the defendant.' ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution and Defense Function § 5.8(b) (Prosecution Function) (Approved Draft 1970). The ABA Code of Professional Responsibility also provides that ' . . . a lawyer shall not . . . (4) Assert his personal opinion . . . as to the credibility of a *witness* . . . ' ABA Special Committee on Evaluation of Ethical Standards, Code of Professional Responsibility, DR 7–106(C)(4) (1969). These standards are in response to the view that ' . . . the cause should turn on the evidence, not on the standing of the advocate, and the witnesses must stand on their own.' ABA Standards, Prosecution, supra at § 5.8(b) (Commentary).

The prosecutor, in branding appellant's testimony as a 'malicious lie' exceeded the permissible bounds of cross-examination. Furthermore, he injected his highly prejudicial personal opinion of appellant's credibility into evidence, thereby clearly and improperly intruding upon the jury's exclusive function of evaluating the credibility of witnesses."

(Citations omitted; emphasis added.) 445 Pa. 284, 286, 285 A.2d 492, 493.

At appellant's second trial, the prosecuting attorney (another member of the Philadelphia District Attorney's Office) committed what the court en banc considered reversible error in his cross-examination of a defense character witness, Reverend Smalls. Reverend Smalls had testified on direct examination by defense counsel that he was acquainted with appellant's reputation in the community, and stated in effect that he had never talked to any one who had spoken ill of appellant. On cross-examination Reverend Smalls was asked:

"Q. Among those people who you spoke to about his reputation for being a good citizen, did you speak to Judge Hoffman, Judge Spaulding, Judge Green?

[defense counsel]: Objected to. I move for a mistrial.
[the assistant district attorney]: Q. Is Mr. John Hampton, the Superintendent of Glenn Mills Reformatory in your congregation?
[defense counsel]: I move for a mistrial."

As stated in the opinion of the court en banc ordering a new trial, the above was an example " . . . of what was a frequent trial tactic of the prosecutor: the inclusion of incompetent evidentiary statements in the language of his questions."

Appellant's third trial saw yet another member of the Philadelphia District Attorney's Office as the prosecuting attorney. Appellant did not testify at the third trial (as he had not at the second). As part of the defense, however, a witness by the name of Irene Williamson was called to the stand. Ms. Williamson, a nurse, was an eyewitness to the shooting and the only eyewitness to testify at the third trial. She testified, as she had at both previous trials, that appellant was not the man who shot the decedent. In rebuttal, the prosecution called Mr. William Stevens, the assistant district attorney who prosecuted the first trial. Mr. Stevens took the stand and testified on direct examination that he had prosecuted appellant's first trial and that Ms. Williamson had once told him that appellant shot Mr. Sinnamon. The following then occurred,

"Q. When Irene Williamson identified Mr. Potter to you from that adjacent courtroom as the youth between the two attorneys, Mr. Stevens, you said that you excused her as a witness thereafter?
A. Yes. I told her she need not come. I didn't say she had to stay away.
Q. Even though she was willing to identify Mr. Potter you took it upon yourself to excuse her, and I would like to make that clear, why did you do that?
[defense counsel]: Objected to, Your Honor. Mr. Gelman is now arguing and testifying in effect.
The Court: His next question is why. Overruled. I will limit it to why he excused her.

[defense counsel]: I will object to that also.

The Court: You may object to it. The objection is overruled.

[defense counsel]: Sir—

The Court: Overruled.

[defense counsel]: Surprising.

The witness: I excused her because I thought it would be improper for me to offer her as a reliable witness. *I considered her unreliable.* (Emphasis added.)

[defense counsel]: Objected to and I move for a mistrial."

I agree with appellant that this motion for mistrial should have been granted. As we said in *Commonwealth v. Potter, supra,* referring to this same assistant district attorney, the prosecutor's expression of his personal opinion of appellant's credibility " . . . clearly and improperly intrud[ed] upon the jury's exclusive function of evaluating the credibility of witnesses." *Id.* 445 Pa. at 287, 285 A.2d at 493. The facts that his opinion in the third trial was expressed from the witness stand and that he was referring to a defense witness rather than to the defendant himself, does not lessen the prejudice caused by such a statement.

We have consistently expressed our disapproval when district attorneys have interfered with the jury's function of resolving credibility conflicts by inserting their personal opinions as to the believability of witnesses. *Commonwealth v. Russell,* 456 Pa. 559, 322 A.2d 127 (1974). *See also, Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974); *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974); *Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972); *Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971).

The prosecution argues, however, that Mr. Stevens' comment as to the witness' reliability here was not improper because Mr. Stevens " . . . was in a position to draw such conclusions from the facts known to him, i. e., that Ms. Williamson had on several earlier occasions been unable to identify the defendant and had, in fact, misidentified other

persons as being the people who participated in the murder." I do not agree.

It is the province of the jury to determine the reliability of witnesses. This they should do from the facts presented to them, uninfluenced as to what the facts mean by the personal opinions of the witnesses who have offered those facts. This is particularly so when the witness is an assistant district attorney, because the prosecutor occupies a unique position as both an advocate and an administrator of justice. As we stated in *Commonwealth v. Russell,* 456 Pa. 559, 564, 322 A.2d 127, 130, ft. n. 5, quoting from *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935),

> "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

*See also, Commonwealth v. Toth,* 455 Pa. 154, 159 n. 4, 314 A.2d 275, 278 n. 4 (1974).

A prosecutor should not " . . . press upon the jury any deductions from the evidence that are not strictly legitimate." *Commonwealth v. Toth,* 455 Pa. 154, 159, 314 A.2d 275, 278. Stevens's testimony that the defense witness was "unreliable" was a personal opinion and was not a "strictly legitimate" deduction of fact from the evidence.

In calling the defense witness "unreliable", Mr. Stevens exceeded the bounds of proper comment upon the facts. Properly, he related the facts of her prior inconsistent statements as to the identity of the assailant. The injection of his personal opinion as to her reliability as a witness was an intrusion into the jury's province of determining the credibility of the witnesses. Furthermore, the prejudicial nature of this intrusion was compounded by the weakness of the foundation on which Mr. Stevens's opinion was based. Throughout the pre-trial investigation and throughout ap-

pellant's first two trials, Ms. Williamson, with one exception, consistently stated her belief that appellant was not the man she had seen shoot Isaac Sinnamon on June 16, 1970. That one exception occurred during a highly suggestive situation in which she stated that appellant, who was seated between his two attorneys at the defendant's table in court, was the one who shot Sinnamon. We have condemned unnecessarily suggestive procedures like this as unreliable, and have refused to allow the jury to hear evidence of such identifications unless the prosecution first shows that the witness's identification is reliably based on observations made at the scene of the crime, and therefore has a basis independent from the suggestive confrontation. *Comm. v. Fowler,* 466 Pa. 198, 352 A.2d 17 (1976). Mr. Stevens's statement was no more than the opinion of a prosecuting attorney that a certain witness could not be depended upon to aid the prosecution's case. Nevertheless, the jury was apt to give the district attorney's opinion far more weight than proper. *Cf. Berger v. United States, supra,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Commonwealth v. Russell, supra,* 456 Pa. 559, 322 A.2d 127 (1974); *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974).

As we said in *Commonwealth v. Revty,* 448 Pa. 512, 517, 295 A.2d 300, 302 (1972):

"The ABA Standards Relating to the Prosecution Function state:

"It is unprofessional conduct for the prosecutor to misstate the evidence or mislead the jury as to the inferences it may draw . . . ' ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution and Defense Function § 5.8a (Prosecution Function) (Approved Draft 1970) at 126–128."

Here, as in *Revty,* the assistant district attorney's remark that the defense's chief witness was "unreliable," "exceeded the limits of fair comment on the evidence." *Id.* 448 Pa. at 517, 295 A.2d at 302. The fact that the statement was made from the witness stand rather than as the prosecuting attorney either in questioning a witness or in addressing the

jury only serves to intensify the prejudice done to the defendant. The prejudicial remarks here are fortified by the oath to tell the truth. Because of this oath, the jury is more likely to overlook the possibility that the witness remains a partisan advocate.

For these reasons I conclude that the trial court's refusal to grant appellant's motion for mistrial was reversible error. Normally this would mandate the award of a new trial. Appellant, also argues, however, that the nature of the prosecutorial misconduct necessitating, as it has, three trials already, was such that appellant's Fifth Amendment double jeopardy rights have been violated, and that the only appropriate remedy is for us to dismiss the indictments against him.

Recently, in *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977) (plurality opinion), we said that the double jeopardy protection against multiple prosecutions prohibits reprosecution where the defendant's mistrial request was occasioned by prosecutorial or judicial overreaching. *Bolden* defined such overreaching to include "gross negligence" as well as intentional misconduct. In *Bolden,* we reached the conclusion, based on the unique facts of that case, that neither the prosecutor's conduct, nor that of the trial judge, amounted to gross negligence so as to bar retrial. In the present case I conclude that the conduct of the district attorney's office amounted to "gross negligence" so as to bar reprosecution on these indictments. This conclusion results from my analysis of the standards to be expected of prosecuting attorneys as they have repeatedly been stated by this Court, and from an examination of the decisions in *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977); *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Martin,* 561 F.2d 135 (8th Cir. 1977); *United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976); and *Commonwealth v. Bolden, supra.*

In *Dinitz,* the United States Supreme Court spoke in terms of "bad faith conduct by the judge or prosecutor." *Id.* 424 U.S. at 611, 96 S.Ct. at 1081, 47 L.Ed.2d at 276. Retrial is barred by the double jeopardy clause where

" . . . 'bad-faith conduct by the judge or prosecutor' threatens the '[h]arassment of an accused by successive prosecutions *or* declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." (Emphasis added.)

This Fifth Amendment bar against reprosecution is applicable to the states through the Fourteenth Amendment to the United States Constitution. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

In *United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976), the Court dealt explicitly with the question of whether double jeopardy "barriers to reprosecution" were applicable to bar retrial of a defendant on whose motion a mistrial was declared by the trial court as a result of "prosecutorial overreaching." As stated by the *Kessler* court, the defendant argued that retrial should be prohibited,

" . . . otherwise 'a prosecutor would have the option of first trying his case with inadmissible, prejudicial, and irrelevant evidence—that is, committing known error—in hopes of "getting away" with it, with the ability to retry the case properly if the first trial is aborted by a mistrial.' " 530 F.2d at 1253.

The *Kessler* court agreed, citing several Supreme Court pronouncements of the interests to be protected by the double jeopardy clause.

"The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. The Court has recently reaffirmed the vitality of this 'underlying idea' expressed in *Green v. United States* in *United States v. Dinitz,* 424 U.S. 600, 605, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267, 273 (1976); *United States v. Jenkins,* 420 U.S. 358, 370, 95 S.Ct. 1006, 1013, 43

L.Ed.2d 250, 259 (1975), and *United States v. Wilson,* 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232, 241 (1975)." 530 F.2d at 1253–1254.

The *Kessler* court then distinguished between mistrials declared by the court *sua sponte* without defendant's consent and those requested by the defendant.

"The distinction between mistrials declared by the court sua sponte and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause. Even when . . . prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire 'to go to the first jury and, perhaps, end the dispute then and there with an acquittal.' *United States v. Jorn,* supra [400 U.S. 470], at 484, [91 S.Ct. [547], at 557, 27 L.Ed.2d [543], at 556]. Our prior decisions recognize the defendant's right to pursue this course in the absence of circumstances of manifest necessity requiring a sua sponte judicial declaration of mistrial. But it is evident that when . . . prosecutorial error seriously prejudices a defendant, he may have little interest in completing the trial and obtaining a verdict from the first jury. *The defendant may reasonably conclude that a continuation of the tainted proceeding would result in a conviction followed by a lengthy appeal, and, if a reversal is secured, by a second prosecution. In such circumstances, a defendant's mistrial request has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions.*" (Emphasis added.) *Id.* at 1254–1255.

The *Kessler* court found that the prosecution's presentation to the jury of testimony which was inadmissible as hearsay (having assured the trial court that the defendant's hearsay objections would be avoided by the presentation of later testimony which would allow defense counsel full opportunity to cross-examine as to the content of those hearsay statements), and which error the prosecutor knew would not be cured by subsequent testimony, was prosecutorial

over-reaching, having amounted to grossly negligent conduct. Quoting from *Dinitz, supra,* the *Kessler* court held that the double jeopardy protection against multiple prosecution barred retrial when the termination of the first trial resulted from such "bad faith" conduct on the part of the prosecution.

Continued harassment of the accused by successive prosecutions is one example of the various situations to which double jeopardy protections apply. *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). Recognizing this principle, we said in *Bolden, supra,*

> "The double jeopardy clause is not designed solely to preclude bad faith harassment of an individual by government prosecutors. It also serves, as emphasized earlier in this opinion, 'to protect the defendant from continued exposure to embarrassment, anxiety, expense, and restrictions on his liberty.' *Illinois v. Somerville,* 410 U.S. [458], at 472, 93 S.Ct. [1066] at 1074, 35 L.Ed.2d 425 (White, J., dissenting, joined by Douglas, J. and Brennan, J.). Prosecutors and judges are public officials entrusted with substantial and sensitive responsibilities. They are required to act in the public interest, which includes protecting the rights of the accused. Society rightfully expects that they maintain professional competence in the exercise of their functions. See generally Pennsylvania Supreme Court Code of Judicial Conduct, Canon 3 and A(1). Compare ABA Project on Standards For Criminal Justice, Standards Relating to the Prosecution and Defense Function, the Prosecution Function, § 1.1(a)–(d) with Pennsylvania Supreme Court Code of Professional Responsibility, EC 6–1, 6–5 (1974). *A defendant forced to request a mistrial by conduct which conspicuously fails to satisfy professional standards should not be required to bear the heavy burdens incident to reprosecution.*" (Emphasis added.) *Id.* 472 Pa. at 641, 373 A.2d at 108.

We concluded in *Bolden* that the prosecutor's action did not rise to the level of gross negligence, and thus, allowed appellant to be retried, stating,

"We conclude, however, after a review of the record, that appellant's trial was not aborted due to prosecutorial or judicial overreaching.

Prior to trial, the prosecutor received information from Donald Darcy which implicated appellant's counsel in a conspiracy to murder the chief prosecution witness. The prosecutor must have realized, at that point, that placing Darcy on the stand would create a conflict of interest between appellant's counsel and appellant which could easily precipitate a mistrial. The prosecutor decided to limit the scope of Darcy's testimony on direct examination in the hope that he then would have no duty to disclose to the defense Darcy's statements which linked appellant's counsel to the murder conspiracy. At trial, however, the court ordered the witness' statements be given to the defense.

Appellant asserts that the prosecutor should have advised the defense of the conflict of interest before jeopardy attached at the first trial. Certainly this would have been the better course of conduct. However, failure to do so in the unusual circumstances of this case did not constitute gross negligence.

While we find that the prosecutor exercised poor judgment, we are not persuaded that his conduct was so far below the standards expected of a prosecutor as to warrant a prohibition against reprosecution. First, we note that under Pa.R.Crim.P. 310, a defendant is not entitled, even upon request, to pre-trial discovery of the written statements of Commonwealth witnesses. Thus, the prosecutor's action conformed with the applicable discovery rules promulgated by this Court. While mechanical reliance on a rule may prove to be unjustified in a particular case if competing constitutional requirements are paramount, we do not believe that the Commonwealth's reliance on Rule 310 was totally unreasonable in these circumstances. Moreover, the record indicates that prior to trial, the police investigation of the alleged murder

conspiracy was an ongoing one and that Donald Darcy, their undercover agent, was extremely apprehensive about his personal safety. We can appreciate the Commonwealth's reluctance to alert possible members of the conspiracy to the discovery of their plans. In short, we are satisfied that mistrial request on appellant's motion was not due to prosecutorial overreaching." (Footnotes omitted.) *Id.* 472 Pa. at 642–645, 373 A.2d at 109–110.

The prosecution's conduct in the instant case, however, fell far short of the level of professional competence which society expects of its representatives. It amounted to a reckless disregard not only of the accused's right to a fair trial, but also of society's interest in having criminal matters adjudicated efficiently and swiftly. With personal knowledge that appellant's first two trials were reversed because of prejudicial prosecutorial misconduct, the assistant district attorney took it upon himself to inject an unwarranted and prejudicial opinion of a kind frequently condemned by this Court.

Although it is difficult to precisely define such terms as "gross negligence," it is clear to me that in this case the prosecutor's intentional acts were so unreasonable, were done with such disregard of appellant's rights to a fair trial and indifference to the high probability that they would substantially prejudice appellant, and were so far from the conduct deemed proper of a prosecutor that they should be treated as if they were intended to cause a mistrial. They are of such a nature that were we to analogize this case to a tort case, we would have no difficulty in labeling them "wilful," "wanton," or "reckless." As such, they clearly fall within the United States Supreme Court's double jeopardy proscriptions, and in order to protect appellant's constitutional rights against multiple prosecutions, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article 1, Section 10 of the Constitution of this Commonwealth, the judgment of sentence should be reversed and appellant discharged.